Good morning, Counsel. Good afternoon, Counsel. It must be afternoon by now, Your Honor. Good morning. May it please the Court, my name is Rafael Del Castillo, and I represent Dr. James Locke here. I would like to reserve two minutes for rebuttal, if I may. Certainly. Try to keep track of yourself if you can. I will, Your Honor. Nothing more than metaphysical doubt. That is what the District Court said that the United States and Dr. Locke here relied upon when it granted summary judgment for appellees, on the grounds that there was no probative evidence of scienture. We proved, based upon objective evidence, that appellees submitted false claims to the government because they submitted claims with Dr. Locke here's provider number when he was not present. With due respect to the District Court, that also was objective evidence that appellees knew they submitted false claims. And I can cite the record for you on that. What is the evidence that they knew? The evidence that they knew was that Dr. Locke here's day sheet, which was submitted at excerpt of Record 193G, stated that he was out sick that day, and that day was a day in which they used his provider number to submit claims. Well, that day sheet has to be turned into the clinic billing at the end of the day. And so they had that in the billing office in their possession when they submitted the claims. Is that for three days? Beg your pardon? Is that for all three days? Every day the doctors had to submit their day sheets to the clinic billing office at the end of the day, Your Honor. So any irregularities that took place, for example, the doctor did not see patients because he was called away, went home sick, had to go over to the hospital to see patients and canceled appointments, they knew that he was out of the clinic. Was that negligence? I beg your pardon? Was that negligence? That's the issue, Your Honor, whether or not it was negligence. Well, I don't know. I'm just wondering, what's the record that they knew definitely he was out of the building and they definitely submitted it anyway because they definitely wanted to subject the government to a false claim? What are these actions? I mean, is this just sloppy work? I mean, is sloppy work scienter? Is negligence scienter? What is it? Your Honor, it's reckless disregard because this is something that took place for five years, more than 250 continuous weeks. They had the same regime in place, and the record shows that in the midst of this. That raises a different question, what kind of hospital this was. Yes, it does. That's the issue. So now you're going back to whether they could do this with these physicians who were not there in the room observing or being around to be potentially available in case of a problem. Which, if I understand you, is the physician-directed clinic rule. Yes, of course. May I address that? I mean, if you can't hide behind that, I mean, then where do you go? You can't go anyplace because you've got to hide behind the physician-directed clinic in this case or you lose. Okay. That's part of their concern. How does that fail here? Well, the judge, as you know, the judge said that it was a physician-directed clinic, and the problem with that is the judge failed to carefully read the secretary's definition of what a physician-directed clinic is. That definition says in a physician-directed clinic, medical management of all services provided in the clinic is assured at all times when the clinic is open. That paragraph begins with the phrase, in highly organized clinics. So let's remember the term sloppy because they admitted they were sloppy and the judge agreed. They were sloppy in submitting those claims. Those were just three claims, and we showed that there were over 380 claims, 82 of which Dr. Locher didn't see the patients. Right. So that goes beyond. Your best evidence to say I answer are the three days he was gone. I beg your pardon? How many claims were involved in the three days that he was gone for which they submitted claims? I don't know the answer to that, Your Honor. I believe that there are fewer than eight claims involved in that period, but I'd have to consult the record to be sure about that. So then the total amount of money involved in that is minuscule. Agreed. But the materiality of what took place here, Your Honor, stretches over a lengthy period of time, and the court did not say that the false claims in the case were immaterial. What the court said was we didn't have scienturic. We do have scienturic because they had a consistent practice in which they did not inform the decisions, I'm sorry, the doctors that they were actually supervising claims. They weren't highly organized. Well, that's a different issue from whether they submitted claims when the doctor was not there. That's a separate issue of whether it's necessary to inform the doctor that being on, in the suite, means that you are responsible for the supervision. It's a chain of events that has to be linked together. No, but surely evidence of scienturism, you take those three days, you exclude them, that's not really what the bulk of the case is about. It's not what Judge Reiner is asking about. Right. That's correct. It's not what the bulk of the case is about. And if we stretch the case over those 200 weeks, 250 weeks, every time a physician was not present in the clinic, when they submitted claims under their physician's provider number, they knew from the day sheet that the physician was not there. Again, we're back to a different issue. There's several different issues. Yes. One, for instance, is whether there was work done in the morning before the physicians arrived there. Indeed. Or at lunchtime when there was a physician, no physician in the suite. Indeed. Whether that was a, is there a dispute of fact over whether that occurred? There was a dispute of fact over whether that occurred, Your Honor, because there was a doctor that submitted an affidavit for Pelleas who said, well, I was there during the lunchtime. And there was Dr. Lokir's assistant who submitted her affidavit that she arrived in the morning before the doctors did, that she stayed through lunch, and she was certain that there were doctors who were not there in the morning when chemotherapy had begun, and she was equally certain that there were doctors not there during lunchtime when there was chemotherapy continuing because they can't take the patients off of chemotherapy that's begun. But the rule is that the physician has to be there throughout the process or you can't bill for it. So is it only her testimony that it was sort of a regular practice that there were not doctors there when the treatment began in the morning and during lunchtime? No, Your Honor. Dr. Lokir also testified to that. The physicians who submitted affidavits in addition to that were Dr. Braun and Dr. Netzer. And if I may turn to that issue, which is essential to the physician-directed clinic matter, and that is that Dr. Braun, Dr. Netzer, the other internists, including Dr. Lokir, were asked, will you supervise the chemotherapy room? And the reason for that is because somebody has to be designated to supervise so that they know they have to be present in the clinic. If a bill is submitted under a provider number, they can't leave first. Secondly, they can't engage themselves in something, excising a boil or another procedure from which they can't extract themselves to provide assistance immediately in the chemotherapy room unless they designate somebody else to cover in a physician-directed clinic, assuming that it's a physician-directed clinic. They can hand off to somebody. But this was not a physician-directed clinic. There was no handoff in the first place. In the second place, they didn't know they had to hand off, so they couldn't hand off. There's no assurance. And the Secretary's definition says assurance. There's no assurance that medical management is there. Did you ever show that when doctors were employed, they were told or not told that part of their function is to be in the suite and that they will be supervising in case there's an emergency, that that's part of their regular function? I didn't. I'm sorry, but I was talking at the same time you were, Your Honor. I didn't hear the first part of your question. Does the record show that? Is there anything in the record that establishes whether or not when doctors are assigned to the clinic or hired to the clinic and told what their duties are? Is there anything about whether they are supervising the oncology work, you know, even though they may not be told which day they're on duty, but that that's part of their function to be supervisors? Dr. Locke's contract is in the record, Your Honor, and it does not specify. It's not in the excerpt of the record, but it is in the record before the district court, and it does not specify that he had to supervise chemotherapy. Is there anything on the other side of the evidence that says that doctors were ñ that was part of their general duty? Not that I'm aware of, Your Honor. The evidence that we have was that the doctors were ñ No, I'm really asking what's the evidence the other side has. You have no evidence other than that Dr. Locke here doesn't have it in his contract, and he says he was not told that that was part of his duty? And Dr. Braun said that as well, and Dr. Netzer said that as well, and also ñ But didn't they sign forms that said that they were there on particular days and doing that kind of work? Covering the chemotherapy room? No, Your Honor. They signed for a brief period of time, the doctors stayed after their clinic day and signed records from the chemotherapy room. That was part of the record that the doctors said, we think this is bad medical practice, we're not going to do this anymore. And that goes to the concerns actually that ñ Did they stop doing that? They did stop doing that. And did they continue to supervise the chemotherapy unit? They did not. Dr. Braun, Dr. Netzer, Dr. Locke here all said we did not supervise the chemotherapy unit. Even when we were signing those records, we were not supervising the chemotherapy unit. Did Dr. Locke here get paid for doing that supervision work? Dr. Locke here got paid a stipend during a two-week period. And again, as I said, we're ñ Only two weeks? Only two weeks. During his whole employment? I beg your pardon? During his whole employment? During his whole employment. Did he seek more compensation for doing that work that wasn't paid? No, Your Honor. Dr. Locke here and the other doctors said, we're not going to do it. Did Dr. Locke here seek records showing that he worked more and should have been paid more for that sort of work? Dr. Locke here sought the records for his billings because he thought that he was not being compensated for all of the work that he was doing. But he was not looking specifically for the chemotherapy claims because at the time he sought the records, he was not aware that they were submitting claims under his number for chemotherapy supervision. When was the first time he was aware that they were doing that? When we got the records in 2002. He thought you were in a production, arguing about how much production your doctor ñ well, I'm using the term revenue generated. That was the issue in terms of the employment situation. The issue in August of 2000, Your Honor, as the record says, for Dr. Locke here, was he asked to see the transactions on his billing number and he was denied. He wanted to check out the allegation that he was underproducing. That's correct. And the denial of access triggered for him the question, why can't I see my records? Which is where the suspicion in the case arises. I seem to remember in the record that Dr. Locke here was called at certain time or times to come into the chemotherapy room because there was a problem and that he did do that. That's correct, Your Honor. Now, at what period of time did that happen? Before he got the records, during the records, after the records? The records you're referring to are the records he was asked to sign. Yeah. I don't specifically remember the date, Your Honor. I don't mean dates. I mean, in general scope, in other words, you said that he didn't know about this requirement to supervise until he got the records that he requested. Now, did these times when he helped in the chemotherapy room happen before that, before he got the records of his payroll or his work records? I don't specifically remember, Your Honor, but with due respect, that is immaterial. Because he's a doctor, if he's called upon to assist a patient in the grocery store, he does so. That doesn't mean he can supervise chemotherapy. That may be true, but you're arguing all kinds of intense and spallous business. I'm just wondering if he was ever in there doing it and what period when that was. Oh, I don't believe he was ever in the chemotherapy room. I beg your pardon. There was one occasion when he was called into the chemotherapy room to help a patient who was having a tachycardia or a fainting spell or something like that. Okay, that's what I'm talking about. Yes. That's one occasion, Your Honor, in 250 weeks. So that's the only time he's ever called in? I believe that's the only time he was ever called in. Okay. But we did establish him. I see that my time is up. I'll save the rest for rebuttal. We'll give you a few minutes for rebuttal. Thank you. May it please the Court, my name is Harry Silver. I'm counsel for the defendants. Good afternoon. I have specific answers to all the questions that the panel has asked, but as you've indicated, it is all over the place and there are several different issues that are at work here. So I think maybe the best course of action would be, if I may, to put this in context to go through an extremely brief procedural history of the allegations in this case. One, which is obvious, this is a fraud case. Under the False Claims Act, a relator or the government has the burden of proving each and every element that false claims were submitted. Also as background, the unrebutted evidence in the record is that there was an oncologist present 95-98% of the time at the clinic. So we are talking about 2-5% of the entire period. Why does that make any difference? No, but just so the Court can understand, we are not talking about, you know, a 10-year period where something has happened. However, this case has really proved to be a moving target. The complaint initially said that the oncology nurses were not qualified to administer chemotherapy and that there had to be an oncologist present while chemotherapy was being administered. We rebutted that with affidavits from all the oncology nurses about their qualifications and their general duties. But now there's no doubt that some kind of a doctor has to be present. That is correct. But one of Dr. Lockyer's complaints here is that they were ambushed by certain evidence. I'm just trying to get straight here how this all played out. But I will say one of the new allegations that surfaced was Dr. Lockyer's deposition. He testified, that's in the supplemental excerpt of Record 258, that he never, repeat, never covered chemotherapy. And there's reference to this in the district court opinion. He said he didn't know what cover meant. To rebut this, we provided irrefutable evidence that he, in fact, did cover and on a lot more than two or three occasions. There are medical records, supplemental excerpt of Record 226 to 238, showing that he was actively involved in the treatment. His own testimony said that he assisted chemotherapy patients when he was called upon. That's in supplemental excerpt of Record 261 to 62 and 265 to 67. The formal assignment sheet that you referred to with the compensation was in an unusual situation where the oncologist gave advance notice that he was going to be gone for a two-week block. And to make sure that that was covered, there was an assignment sheet. But in all other instances, I will freely say, there was not because in a physician-directed clinic, if there is any doctor present and available to provide assistance, that is all Medicare is seeking. That is what supervision means. And I would say you don't even get to see ENDR if there's no violation. I just think it's a little odd that you would say that you're going to seek money for supervising with somebody who says, I'm not supervising, I don't want to supervise, I'm washing my hands. I mean, in the common sense view of this situation. You can say it's shielded legally, but if the doctor says, I'm not going to provide this service, and you charge for it, there's something that seems a little bit amiss. Except in this clinic, again, in the physician-directed clinic context. Right, but this is slightly different. Even accepting your definition, if you have a physician that says, I'm not going to do this service, how can you charge for it? Because other physicians did. The other point I want to make here is, as far as no violation, there has been no showing here that the particular identification number of a particular doctor is material to Medicare's decision to pay. The unrebutted testimony in the record is that there were always five to seven internists in the internal medical suite at any time. So if Dr. Lockyer went home sick two or three days, to use that example, that does not mean that there were not other doctors who were uncovering. But if they use this number, is that sloppy negligence, fraud, intentional deceit? What is it? It can't be intentional deceit, because Medicare got what it paid for. What Medicare paid for was supervision, backup. Well, in any case where Dr. Lockyer's number was used, have you proved in each case that there are these other people there? We have proven generally that there were always five to seven physicians. Well, now we're back to general. Well, the oncology nurses all stated that they did not administer chemotherapy unless there was a physician present. This wasn't to avoid fraud. It wasn't for Medicare reasons. This is sound medical practice. They were running a clinic and administering care to patients, and they were not going to endanger those patients. All of the nurses said, if there's no physician present, we will not administer chemotherapy or we will stop the chemotherapy if the physician leaves. How about the day that Dr. Lockyer went home sick? The day that Dr. Lockyer went home sick, there was no evidence at all that there was no other internal medicine physician on the floor, and, in fact, the nurses would have known. So the only, if you will, irregularity there was that his number was used even though he went home sick. That's correct, and that's why I started with burden of proof. There has been no attempt at a showing that the particular number that is used in a given case is material, as long as the service was, in fact, provided. And what's the point of Medicare requiring it? Medicare? Well, I mean, you're a supervising physician. It is that. It turns out you can lie on this form every single time. It could be somebody who's not even, he's deceased. It doesn't make any difference. That's your argument, isn't it? No, this is not like the cases. I'm not saying it's fraud. I'm just saying that's basically your argument. It makes absolutely no difference at all. What physicians identified living, dead, fictional, or not? No, it has to be. It's not material, but the number is who the person listed is. It's not material, is what you're saying. Right. That person doesn't have to exist as long as there were other doctors there at the time. Yes, except that was not the general practice, and I'm only using that for those three days when Dr. Blocker went home sick and the district court determined that the clinic did not know he went home sick that day. Let's say that somebody puts down Abraham Lincoln as a supervising physician. It's his birthday. We want to honor him. And Medicare says, well, okay. Well, if Abraham Lincoln has a Medicare provider number. No, but that's not the practice here. Right. But this is what I guess I'm struggling to understand. I mean, all physicians in society. What you're saying is it's completely irrelevant to Medicare whether or not this person is there or not, whether he's supervising or not, but you have to use the number. I'm sorry. To avoid your hypotheticals and everything else, I would prefer to phrase it in terms of Medicare got what it paid for and this was not a consistent practice that was used, and no one went out of their way to use the wrong provider number. Well, other people got sick also and weren't there on their sick days. And if it happened when this doctor got sick, it probably happened when the other doctors got sick. Their names were probably listed also. So as Ted Burnett said, you know, is it just sloppiness or is it reckless disregard? And as you would say, is it a harmless error? I would say it's a harmless error. I certainly wouldn't say it's reckless disregard because, again, there's no fraud that Medicare got what it paid for. The government's had- Well, you keep saying that. That's fine. That's very good that Medicare got what it paid for, but we can sit here all day and do what ifs and come up with all kinds of exceptions. The point is, is that counsel is saying it goes back, I think maybe the bigger issue, this is supposed to be a physician-directed hospital, so you have to have some order in order to have a physician-directed hospital. So if they're going to be sloppy, careless, they got what they paid for, is that a physician-directed hospital? What kind of standards do we look at this hospital for on what they were doing? The standards were, again, I go back to the unrebutted testimony of the nurses saying they did not administer chemotherapy if there was no physician present. Everybody understood that rule. There is nothing in the record to reflect that. Well, isn't there a factual dispute on that? Isn't there- Counsel told us there were declarations by other people that said the nurses started this before the doctors got in? There was one declaration, which was by Dr. Lockyer's assistant, who is not a physician, who says she saw chemotherapy being administered prior to the time doctors got there, but does not say exactly what she saw. The nurses said that prior to the time the doctors arrived, they did preparatory work. They drew blood, which nobody is contending requires physician supervision. They were not-there was no IV bag with chemotherapy in it, and it is not clear at all what the affiant saw, did see, or had any ability to know what she was seeing. She just said, I got in early, I looked, I saw there was chemotherapy going on. What about lunchtime? Didn't she or any others say that there were no doctors on the floor at lunchtime? Leaving aside the fact that the nurses said they didn't administer when there was no doctor there, there was Dr. Diaz, who said that he always worked through lunch, that he sat at his desk doing his paperwork during lunch and took his lunch at his desk. Dr. Pixler submitted an affidavit that said she often covered during lunchtime, and with those which are unreported, you know, the clinic was technically closed between 12 and 2. I thought there was something that said they didn't stop the chemotherapy. That's correct. Dr. Diaz was there, Dr. Pixler was there. Dr. Pixler was there sometimes, he said very much. Right. And Dr. Diaz said he was always there. Dr. Diaz was there always during lunch. Yes. And we have on the other side this aide who says there were many times when I saw no doctor during lunch. Doesn't that create a factual dispute? But it does not create a factual issue when the only time she said that she saw chemotherapy was in the early morning hours. No, no. She did not say that she saw chemotherapy being administered during lunch when there was no doctor present. Well, I thought the testimony was if they don't interrupt chemotherapy, that it continues through lunch. It does, but there were doctors present. Well, back to... Well, chemotherapy is not a continuous process. It's several different stages, and the nurses can stop it at any time. Again, no one rebutted the nurses saying they do not inject chemotherapy agents while there's no physician present. It's bad practice. It's bad medicine. It's dangerous. They don't do it. But I gather, and I know this is a part of the relevance of the False Claims Act, a sort of relevance of what I would call what's really going on here, I gather the doctors weren't given production credit for the amounts that they were paid, I'm sorry, that the clinic received on their behalf for supervising. Is that true? For chemotherapy, that isn't generally true. So who paid the production credits? The oncologists? The oncologists. So in other words, they were paid, the clinic was reimbursed for what Dr. Locke here supposedly was doing in supervising while the oncologist was away, but the oncologist on the terms of the agreement got credit for the production. Right, but it should be understood that in the overwhelming majority of cases, the supervising doctor wasn't needed and was never called. It's just somebody who was there... Which you were compensated for. As a backup. Right, but you were paid for it. The clinic was paid for it. The clinic here is the provider. There's no doubt about that. And the money is divided up internally under the employment contract. That has nothing to do with Medicare. No, I understand. That's what's really going on. Right, and also, under the employment agreement, the one that Dr. Locke here signed, one of his duties was to supervise non-physicians. That is, in the employment agreement, that's the supplemental excerpt of Record 137. It's the same agreement that states that the clinic provided the malpractice insurance, the clinic indemnified all the doctors against malpractice, and the clinic submitted the claims to Medicare as a clinic and received the money in and divided the money according to the employment contract and the compensation formula. Did Dr. Locke here at any time question whether or not he was properly being reimbursed for times when he had to cover or do the work with the clinic and that he was concerned about he wasn't getting paid for it if he did that supervision? He may have, but I think the record is clear that Dr. Locke here was not happy with his compensation in general, and this was just one of those. Was that part of his concerns, the fact that he was supposedly supposed to be supervising under the physician-directed hospital policy the chemotherapy and he might have been doing it and he wasn't compensated for that and the oncologist is getting credit for it? That was not a concern that is in the record, and in fact, I think the record is clear that Dr. Locke here didn't realize that that's what was going on until the employment arbitration. That's when he saw those records, and if I may, on that point, much is made in Dr. Locke here's brief about a two-year struggle to get his records. There is absolutely nothing in the record to support that claim. The earliest in the record is a letter from Dr. Locke here's counsel to Dr. Epsilon on May 24, 2002, which was the first request that is in the record for documents. That's in SER 112 to 115, and there was a follow-up letter in June that's in the excerpt of the record at 245, seeking records to support the salary determinations made by the clinic and demanding arbitration on the compensation issues only. So there is no support at all in the record that this was a struggle by the doctor against administration where he smelled a rat, I think is what the brief said, and wanted to verify his own claim forms in the records. There is absolutely no evidence of that, and there's no record support for that. Thank you, counsel. Thank you. All right, we'll give you a couple of minutes. Certainly, Your Honor, thank you. The briefs and the argument that we are making at this level are on issues that should have been resolved by a jury at the district court level, not by the court. Judge Kaye did not follow the summary judgment standard because, as the court can see, there's disputes about all of the facts involving whether this was a physician-directed clinic, whether these doctors were told they were supervising, the number of instances in which the defendant or the appellees submitted claims for billing numbers of doctors who were not present, and that is the rule. And also, the fundamental issue that Your Honor raised at the beginning, were they sloppy? Were they negligent, or was it really reckless? Was it really reckless to not tell these doctors and deliberately keep them in the dark because the oncologist was being compensated for time that they were working in? Well, what about the provision, counsel, from the contract that one of the duties is to supervise non-doctors? You ask me, Your Honor, if there was a provision in Dr. Loker's contract that he supervised the oncology nurses. There wasn't. And that is not a provision that requires him to supervise the oncologist. Why do you need a specific mention if one of his duties is to supervise the non-medical personnel? Your Honor, there were over 60 physicians in this clinic, and there were lab techs, there were phlebotomists, there were med assistants who ran the physician's individual clinics. And so I believe that Dr. Loker and all of the doctors who read that, if in fact they read it, understood that they were responsible for generally supervising people who were on duty in the clinic, and if there was something going on with a phlebotomist or somebody that maybe there was a problem with a patient that the doctor was in a supervisorial capacity as far as that was concerned, that does not get there as far as a physician-directed clinic requirement in the contract, because these doctors didn't understand. They had to be there. They had to be immediately available. They had to be available to provide immediate assistance in chemotherapy, not just happen to be on the second floor. They had to be conscious of what was going on, and that is basically what the defendant's or the appellee's position is. They don't have to be conscious. They don't have to know. They don't have to know what's going on in the chemotherapy room. They don't even have to know what the practice over there is good. Is that your interpretation of physician-directed hospital, or is that the legal definition of what the duties are as far as liability is concerned? The secretary says that it is a highly organized situation in which the medical management of every service while the clinic is open is assured. That's the way I read it, Your Honor, and that I think means that there has to be a physician who understands something is happening and knows that that physician is responsible for that happening, and if that physician can't be there, then they hand off to somebody. That's highly organized. That's organized towards good health care, and that's what I think the secretary means. Thank you, Kevin. Case to start will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Brunetti, Thomas